UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| RICHARD MAX STRAHAN, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 19-cv-10639-IT |
| | * | |
| SECRETARY, MASSACHUSETTS | * | |
| EXECUTIVE OFFICE OF ENERGY AND | * | |
| AND ENVIRONMENTAL AFFAIRS, | * | |
| et al., | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM & ORDER
GRANTING IN PART AND DENYING IN PART
PRELIMINARY INJUNCTIVE RELIEF

April 30, 2020

TALWANI, D.J.

Before the court is Plaintiff Richard Max Strahan's Motion for Preliminary Injunction [#144]. Plaintiff requests interlocutory relief enjoining the Massachusetts Executive Office of Energy and Environment Affairs ("MEOEEA") and the Director of the Massachusetts Division of Marine Fisheries ("Fisheries Division") from licensing the use of vertical buoy ropes ("VBRs") in Massachusetts coastal waters and requiring them to immediately apply for an Incidental Take Permit pursuant to Section 10 of the Endangered Species Act. Plaintiff argues that VBRs harm and kill critically endangered animals such as the North Atlantic right whale (the "right whale"), and that Defendants' licensing of VBRs for use in lobsterpot and gillnet fishing in Massachusetts state waters without an Incidental Take Permit therefore violates the Endangered Species Act's provisions prohibiting the harming, harassing, or killing of endangered species.

1

For the reasons stated below, the court finds that Plaintiff is likely to prevail on his claim that the deployment of VBRs in Massachusetts waters has violated and will continue to violate the Endangered Species Act. Although Defendants and Massachusetts fishermen have made substantial efforts to protect endangered whales from VBRs and may well have made greater efforts than other jurisdictions, Plaintiff is likely to be able to establish that Massachusetts VBRs have harmed and will continue to harm these animals and that the continued deployment of these ropes thus violates Congress's directive that all harmful contacts with endangered animals are to be prohibited, whatever the cost.

However, Congress has set forth a permitting process through appropriate expert agencies that allows for the incidental taking of endangered species *if* the agency is satisfied that such incidental takes will, among other things, not threaten the survival of the species. The determination to allow such takings, however, is for the expert agency, and not the court, to make. Accordingly, the court GRANTS Plaintiff's motion to the extent that it seeks an order directing the Defendants to obtain an Incidental Take Permit if they are to continue licensing the use of VBRs in Massachusetts coastal waters.

Recognizing the inequitable hardship posed to Massachusetts fishermen and the fishing industry if the court immediately enjoins the use of VBRs, the court declines to order the further relief sought by Plaintiff at this time. But, because it was Congress's plain directive that activities that harm endangered species must come to an end unless otherwise permitted by law, Plaintiff may renew his motion for a preliminary injunction in 90 days if Defendants have not obtained an Incidental Take Permit allowing the continued licensing of VBRs in Massachusetts state waters.

I.   The Endangered Species Act

Congress enacted the Endangered Species Act (the "Act" or "ESA") in 1973. The Act's stated purpose was "to provide a program for the conservation of such endangered species and threatened species" based on Congress's finding that various species of animals had been "rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation" and that other species "have been so depleted in numbers that they are in danger of or threatened with extinction." 16 U.S.C. §§ 1531(a)(1)&(2), (b). The ESA "represented the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." Tenn. Valley Auth. v. Hill, 437 U.S. 153, 180 (1978) ("TVA").

Among other provisions, Section 9 of the Act made it so that "[v]irtually all dealings with endangered species, including taking, possession, transportation, and sale, were prohibited, except in extremely narrow circumstances." TVA, 437 U.S. at 180 (citations omitted). Congress broadly defined a "take" to mean "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" a protected species. 16 U.S.C. §§ 1532(19), 1538(a)(1)(B); see also Strahan v. Coxe, 127 F.3d 155, 162 (1st Cir. 1997) ("'Take' is defined . . . in the broadest possible manner to include every conceivable way in which a person can 'take' or attempt to 'take' any fish or wildlife"). To be sure, Congress understood the potential economic impact of these restrictions; as the Supreme Court has noted, "[t]he plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost." TVA, 437 U.S. at 184.

The ESA not only prohibits the direct take of endangered species, but also renders it unlawful for anyone "to attempt to commit, solicit another to commit, or cause to be committed, any offense defined" in the Act. 16 U.S.C § 1538(g). In Strahan v. Coxe, the First Circuit concluded that governmental actors could be found liable under the Act where "the state has

licensed commercial fishing operations to use gillnets and lobster pots in specifically the manner that is likely to result in a violation of federal law." 127 F.3d at 164.

Section 9's prohibition on takes of endangered species is extremely broad but not absolute. Section 10 of the Act contains a relief valve in the form of Incidental Take Permits that may be issued by the Secretaries of Interior or Commerce. The Secretaries have charged the National Marine Fisheries Service ("NMFS" or "NOAA Fisheries") with administering the incidental take permitting process for marine species. Incidental Take Permits exempt an actor from liability under Section 9 of the Act if they cause a take that was "incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B). The process and requirements for obtaining such a permit are laid out by statute and regulation. The applicant must submit a conservation plan that specifies, inter alia, the impact from the proposed take and the steps being taken to minimize and mitigate those impacts. If NOAA Fisheries finds that, by the conservation plan, "the applicant will, to the maximum extent practicable, minimize the impacts of such taking" and that "the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild," then NOAA Fisheries may issue a permit that may also be accompanied by "such terms and conditions as the Secretary deems necessary or appropriate to carry out the purposes" of the incidental take provisions. 16 U.S.C. § 1539(a)(2)(B); see also 50 C.F.R. § 222.307. Without an Incidental Take Permit or other lawful exemption, every take of an endangered species constitutes a Section 9 violation.

The right whale, *Eubalaena glacialis*, is an endangered species protected under the Act. 50 C.F.R. § 17.11.

II.   <u>Procedural Background and Related Actions</u>

The claims here—that the use of VBRs harm and kill critically endangered right whales and that permitting of VBRs in lobsterpot and gillnet fishing violates the ESA—are not new.

Plaintiff has prosecuted such claims in the District of Massachusetts in fits and starts since 1995. Because these actions provide context for the present motion, the court reviews them briefly before discussing three challenges to VBRs from outside this district.

In 1995, Plaintiff sued the Defendants, alleging, inter alia, violations of the ESA. <u>Strahan v. Coxe</u>, No. 95-10927-DPW (D. Mass.). As here, Plaintiff requested a preliminary injunction. Following an evidentiary hearing, the court, Woodlock, J., found it "clear that endangered whales use Massachusetts coastal waters where gillnets and lobster gear are placed, and that gillnets and lobster gear have harmed endangered whales and are likely to continue doing so." <u>Strahan v. Coxe</u>, 939 F. Supp. 963, 989 (D. Mass. 1996). So finding, the court determined that interlocutory relief was warranted. The court ordered Defendants to apply for an Incidental Take Permit from NOAA Fisheries and, in the meantime, to develop a proposal that would "restrict, modify or eliminate the use of fixed-fishing gear in coastal waters of Massachusetts listed as critical habitat for Northern Right whales in order to minimize the likelihood additional whales will actually be harmed by such gear." <u>Id.</u> at 990. The court further ordered the commission of a working group to facilitate substantive discussions between the parties on what might be done to minimize the likelihood of harm to right whales from fishing gear. On appeal of the preliminary injunction, the First Circuit upheld Judge Woodlock's order that Massachusetts apply for an Incidental Take Permit under the Endangered Species Act. <u>Strahan v. Coxe</u>, 127 F.3d at 164.[1]

---

[1] Plaintiff had also sought relief in that case under the Marine Mammal Protection Act of 1972 ("MMPA") and Judge Woodlock ordered Defendants to apply for an Incidental Take Permit

On remand, and "[a]fter allowing several years of experience with the additional protective measures developed by the Commonwealth in consultation with various interested parties as a consequence of the interlocutory relief," the court determined that "it was appropriate to bring the case to final judgment." Order, Strahan v. Coxe, No. 95-10927-DPW (D. Mass. Mar. 29, 2001), ECF No. 420. Judge Woodlock found that the additional protective measures undertaken, in part, through administrative rulemaking, transformed "the factual predicates upon which this litigation proceeded," and stayed the proceedings while Defendants negotiated a resolution with an intervening plaintiff, the Conservation Law Foundation ("CLF"), over Mr. Strahan's objection. Id. In April 2001, the CLF entered a settlement agreement with at least some of the Defendants. Stipulation (Apr. 27, 2001), ECF No. 426. Shortly thereafter, on Plaintiff's motion for dismissal of his claims, Judge Woodlock dismissed Mr. Strahan's claims with prejudice. Order of Dismissal (July 19, 2001), ECF No. 436 (dismissing action with prejudice); see also ECF No. 438 (clarifying order).

In 2005, Plaintiff brought another action against, largely, the same Defendants. Strahan v. Diodati et al., No. 05-10140-NMG (D. Mass.). In his new complaint, Plaintiff alleged that in the years since the dismissal of his prior action, endangered whales had continued to become entangled in gear such as VBRs licensed by the Defendants. Complaint at ¶¶ 17-18 (Jan. 21, 2005), ECF No. 3. Plaintiff again requested, in addition to other relief, a preliminary injunction enjoining Defendants from further licensing the deployment of fishing gear such as VBRs until

---

under both the Endangered Species Act and the Marine Mammal Protection Act. The First vacated the order as it related to the MMPA, finding that the district court had no jurisdiction to hear a citizen suit under the MMPA, and the court therefore could not order a remedy requiring compliance with the MMPA. Strahan v. Coxe, 127 F.3d at 161. Plaintiff does not bring a MMPA claim in the present action.

such gear was proven not to pose a threat to endangered whales. Pl.'s Mot. Temp. Restraining

Order and Prelim. Injunction (Jan. 21, 2005), ECF No. 2. After hearing three days of testimony,

the court, Gorton, J., found that Plaintiff had not demonstrated a "'strong showing' of likelihood

of success on the merits on his underlying claim that the defendants have violated the ESA"

because Plaintiff had "presented no conclusive evidence demonstrating that protected whales

have, since 2002, become entangled in Massachusetts coastal waters or in fishing gear licensed

by the defendants." Strahan v. Pritchard, 473 F. Supp. 2d 230, 238 (D. Mass. 2007) (citing In re

Pye, 38 F.3d 58, 63 (1st Cir. 1994)). Nevertheless, finding that the fishing gear posed a threat to

the endangered whales, the court found "careful monitoring" to be justified. Id. at 241.

Accordingly, the court ordered the action stayed for two years, during which time the parties

were ordered to file joint status reports informing the court of any new entanglements in

Massachusetts waters or in gear licensed by the Defendants and other changes in relevant

regulation or technology. Id.

       In accordance with Judge Gorton's ruling, the parties filed the required status reports.

The reports, including a supplemental report, indicated that there had potentially been three

known entanglements in Massachusetts waters or in gear licensed by the Defendants. Strahan v.

Diodati, 755 F. Supp. 2d 318, 322 (D. Mass. 2010). The court offered Mr. Strahan the

opportunity to obtain additional discovery related to these three putative entanglements but

Plaintiff declined to pursue any additional discovery. Id.

       After Judge Gorton lifted the two-year stay, Defendants moved for summary judgment.

Citing Plaintiff's failure to conduct discovery of the new putative entanglements, the court found

that there remained no "conclusive evidence that the defendants actually caused any takings

during the relevant time period." Id. at 325. The court further found that the efforts undertaken

by the Massachusetts Defendants caused them to be "at the forefront in taking regulatory steps to eliminate contact between whales and fishing gear, rendering the risk of entanglements 'nearly nonexistent.'" Id. In so finding, Judge Gorton cited Defendants efforts to monitor developments in fishing gear, incorporate such advances into the regulatory scheme, increase surveillance of Cape Cod Bay, require additional reporting by fishermen, and cooperate with other agencies to enforce regulatory requirements. Based on these twin findings—that Plaintiff had not provided conclusive evidence of an entanglement and that there was a "nearly nonexistent" chance of any future entanglements—Judge Gorton allowed Defendants' motion for summary judgment. Because Judge Gorton's 2010 decision constituted judgment against Plaintiff on his Endangered Species Act Section 9 claim against the Defendants, in determining Plaintiff's likelihood of success on the present claim the court does not consider claims of takes that predate Judge Gorton's 2010 decision.

In 2018, Plaintiff filed another action against the Defendants. Strahan v. MEOEEA, No. 18-cv-10392-DJC (D. Mass.). Plaintiff's new complaint alleged that in the years since the 2010 decision, the right whales' situation had become drastically more perilous. Complaint ¶¶ 45, 51–52 (Feb. 28, 2018), ECF No. 1. Plaintiff moved for a temporary restraining order, requesting that the court enjoin Defendants from continued licensing of lobsterpot fishing gear in Massachusetts state waters. The court, Casper, J., denied the emergency order primarily on the basis that Plaintiff had failed to satisfy the Endangered Species Act's 60-day notice requirement.[2] Elec.

---

[2] In addition to citing Plaintiff's failure to comply with the Endangered Species Act's mandatory notice provision, Judge Casper found that Plaintiff had not made a "strong" showing of a likelihood of success on the merits since Plaintiff claimed a "continuous violation of the ESA's Section 9 prohibitions" and Plaintiff could only prove one entanglement since 2010, the 2016 entanglement. Id. Furthermore, given Defendants' efforts to reduce entanglements, the court was

Order (May 15, 2018), ECF No. 56. Plaintiff later moved for a preliminary injunction, but in October 2018, withdrew that motion and moved for voluntary dismissal pursuant to Fed. R. Civ. P. 41(a). See Pl.'s Mot. Prelim. Inj. (July 15, 2018), ECF No. 73; Pl.'s Notice (Oct. 11, 2018), ECF No. 95. The court allowed dismissal without prejudice and denied all pending motions as moot. Elec. Order (Oct. 18, 2018), ECF No. 97.

Plaintiff filed the instant action on April 4, 2019, against, inter alia, the Massachusetts Executive Office of Energy and Environmental Affairs ("MEOEEA") and David Pierce.[3] Defendant MEOEEA oversees the Division of Marine Fisheries ("Fisheries Division") in Massachusetts, which has authority to "administer all the laws relating to marine fisheries" in the Commonwealth; Defendant David Pierce[4] was the director of the Fisheries Division. Mass. Gen. Laws ch. 130, §1A (2019); Compl. ¶ 14 [#68].

Alongside the Complaint [#1], Plaintiff filed a Motion for a Temporary Restraining Order [#3] requesting that the court enjoin the continued licensing of VBRs. The court denied the motion without prejudice as Plaintiff had failed to appropriately certify efforts made to give notice to Defendants. Order 1–2 [#8]. On April 21, 2019, Plaintiff filed an Emergency Motion for a Temporary Restraining Order [#14]. The emergency motion represented that Defendants

---

"not persuaded that right whales will suffer irreparable harm absent the injunctive relief Strahan presently seeks on an expedited basis." Id.

[3] Plaintiff brought claims against other Defendants, including the President of the Massachusetts Lobsterman's Association and the Center for Coastal Studies. The court dismissed these claims for failure to state a claim for which Plaintiff was entitled to relief. See Memorandum and Order [#160].

[4] Since this action was filed, Defendant Pierce is no longer the director of the Fisheries Division. That role is now served by Daniel J. McKiernan as acting director. See Defs.' Opp'n 5 [#164]. Pursuant to Fed. R. Civ. P. 25(d), McKiernan is automatically substituted as a party to this action.

intended to reopen Cape Cod Bay to lobsterpot fishing on May 1, 2019, despite over one hundred right whales remaining in Massachusetts coastal waters. Plaintiff sought to extend this closure to at least June 1, 2019. Pl.'s Mot. 2 [#14].

The court held a hearing on the emergency motion on April 29, 2019, and denied it the next day. See Elec. Order [#25]. The court found that since Defendants had decided to close the area at issue to lobsterpot fishing through May 8, 2019, there was no threat of immediate and irreparable harm *in the interim period*. Accordingly, the court converted Plaintiff's motion to one for a preliminary injunction, invited further briefing, and set a hearing for May 6, 2019, two days before the closed area was set to reopen. However, Plaintiff immediately notified the court that he did not have the "resources or interest in pursuing any preliminary injunction of the defendants" before the Fall of 2019. Pl.'s Mot. [#28]. Accordingly, the court terminated the pending motion and cancelled the May 6, 2019 hearing. Elec. Order [#29].

Meanwhile, Defendants filed a Motion to Dismiss [#117] asserting, inter alia, that NOAA Fisheries' Atlantic Large Whale Take Reduction Plan, 50 C.F.R. § 229.32—promulgated pursuant to the Marine Mammal Protection Act's directive to NOAA Fisheries to develop and implement a "take reduction plan designed to assist in the recovery or prevent the depletion" of marine mammals by commercial fisheries, such as the lobsterpot fishery, 16 U.S.C. § 1372(a)— made Defendants' continued licensing of VBR's lawful. In the Memorandum and Order 5 [#160] denying Defendants' Motion, the court found this argument unpersuasive where Plaintiff had adequately pleaded that Defendants had committed a violation of Section 9 of the Endangered Species Act.[5]

---

[5] This argument—that Marine Mammal Protection Act or regulations promulgated pursuant to that Act, abrogated obligations under the Endangered Species Act—was not raised by

Plaintiff filed the pending <u>Motion for Preliminary Injunction</u> [#144] on January 30, 2020.
Plaintiff's renewed motion requests that the court enjoin Defendants: 1) from licensing VBRs in
Massachusetts state waters; 2) from requiring the use of VBRs by those seeking to obtain a
lobsterpot and gillnet fishing permit; 3) from participating in NOAA's Atlantic Large Whale
Take Reduction Team; and 4) requiring Defendants to immediately apply to NOAA Fisheries for
an Incidental Take Permit pursuant to Section 10 of the Endangered Species Act. Defendants
filed an <u>Opposition</u> [#164] on February 18, 2020, and the court held a hearing on the motion on
March 5, 2020, and took the matter under advisement.

While these actions have been proceeding in this district, Plaintiff has pursued a similar
action in federal court in Maine. There, Plaintiff has sued the Commissioner of the Maine
Department of Marine Resources and NOAA Fisheries. The court, Walker, J., denied an
emergency temporary restraining order on November 5, 2019, finding that prohibiting the use of
VBRs would have the practical effect of "suspending the existing fishery altogether," that such
an order would impose a substantial hardship on third-party fishermen, "effectively deprive
Defendants of their role as duly-appointed executive agents with regulatory oversight of lobster
fisheries and marine policy," and these considerations "militate strongly against a temporary
restraining order." <u>Man Against Xtinction v. Comm'r of Maine Dep't of Marine Res.</u>, No. 1:19-
CV-00406-LEW, 2019 WL 5748317, at *2 (D. Me. Nov. 5, 2019). Defendants' motion to
dismiss Mr. Strahan's complaint is currently unopposed.

---

Defendants in opposition to the motion for preliminary injunction. However, it was recently
dismissed by another district judge in a decision discussed at greater length, below. <u>Ctr. for
Biological Diversity v. Ross</u>, No. CV 18-112 (JEB), 2020 WL 1809465, at *9 (D.D.C. Apr. 9,
2020) ("The statutory text itself harmonizes the ESA and the MMPA quite clearly by requiring
that both be satisfied in the case of marine mammals").

In the District of Columbia, the CLF and the Center for Biological Diversity ("CBD") have brought two related actions against the Secretary of Commerce[6] and other Defendants. In one, the CLF challenged NOAA Fisheries' decision to reopen to gillnet fishing in two regions of federal waters off of New England that are feeding grounds for the right whale.[7] Conservation Law Found. v. Ross, 422 F. Supp. 3d 12 (D.D.C. 2019). The CLF argued that in reopening the areas to gillnet fishing, NOAA Fisheries failed to comply with the Endangered Species Act's requirement that federal agencies such as NOAA Fisheries determine if their actions will affect endangered species and consult with an expert agency[8] before proceeding. Id. at 29. On October 28, 2019, the court, Boasberg, J., granted CLF's motion for summary judgment and request for injunctive relief. Finding the question "ultimately not a close call," the court concluded that reopening specific areas of federal waters to gillnet fishing would cause irreparable injury to the right whales. Id. at 16. NOAA Fisheries appealed Judge Boasberg's finding that NOAA Fisheries had violated the Endangered Species Act and his decision to issue an injunction. See Statement of Issues, Conservation Law Found. v. Ross, No. 19-5365 (D.C. Cir.), ECF No. 1826851. However, on April 23, 2020, NOAA Fisheries moved to voluntarily withdraw its appeal.

In a second case, CLF and CBD and other plaintiffs (the "CLF Plaintiffs") challenged the legality of a 2014 Biological Opinion, produced by NOAA Fisheries, which concluded that the American lobster fishery would not jeopardize the continued existence of the right whale. Ctr.

---

[6] The Department of Commerce is the parent agency for NOAA Fisheries.

[7] These regions had previously been subject to a prohibition on gillnet fishing for over twenty years. Conservation Law Found., 422 F. Supp. 3d at 18.

[8] Although the expert agency is also NOAA Fisheries, it is a specific branch of NOAA Fisheries known as the Protected Resources Division, which was not, in this case, the action agency. Conservation Law Found., 422 F. Supp. 3d at 16.

for Biological Diversity v. Ross, No. CV 18-112 (JEB), 2020 WL 1809465 (D.D.C. Apr. 9, 2020). The CLF Plaintiffs argued that NOAA Fisheries was required under the Endangered Species Act and its enforcing regulations to produce an Incidental Take Statement since NOAA Fisheries anticipated right whales would be harmed by the continued operation of the American lobster fishery in federal and state waters managed by NOAA Fisheries. Judge Boasberg agreed, rejecting the argument that NOAA Fisheries' obligations under the Marine Mammal Protection Act do not supplant its obligations under the Endangered Species Act, and on April 9, 2020, granted Plaintiffs' motion for summary judgment.[9] Id. at 9. The question of remedies remains before the court. Minute Order, Ctr. for Biological Diversity v. Ross, No. CV 18-112 (JEB), (D.D.C. Apr. 24, 2020).

III.   Legal Standard for Relief

The Endangered Species Act's citizen suit provision grants "any person" the authority to commence a civil suit in United States district courts to enforce a violation of any provision of the Act. 16 U.S.C. § 1540 (g)(1). The provision includes the right to seek an injunction against "any person, including the United States and any other governmental instrumentality or agency" alleged to be violating the Act. 16 U.S.C. § 1540.[10]

---

[9] The CLF Plaintiffs also challenged NOAA Fisheries' biological opinion on other grounds, including that it constituted a violation of Section 9's prohibitions on unlawful takes. Judge Boasberg did not reach this question but noted that "just because the Court had no need to discuss other features of the 2014 [biological opinion] does not mean that they complied with the ESA." Id. at 19.

[10] The Act limits this authority "to the extent permitted by the eleventh amendment." 16 U.S.C. § 1540(g). The First Circuit discussed the constraints provided by the Tenth and Eleventh Amendments in Strahan v. Coxe and rejected the Defendants' argument that these amendments constrained the district court's ability to fashion injunctive relief. 127 F.3d at 166–70.

The court's equitable jurisdiction under the Act is broad and includes the power to issue a preliminary injunction upon consideration of the canonical four-part framework employed in this circuit: (1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest. Strahan v. Coxe, 127 F.3d at 160 (citing Ross–Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 15 (1st Cir.1996)). Although the court must evaluate each of the four considerations, the First Circuit has found that under the Endangered Species Act, the balance of the hardships and the public interest tip "heavily in favor of protected species." Strahan v. Coxe, 127 F.3d at 160 (citing National Wildlife Fed'n v. Burlington Northern R.R., 23 F.3d 1508, 1510 (9th Cir. 1994)). Nevertheless, as with any preliminary injunction, the injunction shall only issue if plaintiff makes a clear showing that it is entitled to such relief. Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008); Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 158 (2010) ("a court must determine that an injunction *should* issue").

In determining whether a plaintiff has made a showing of entitlement to relief, the court considers evidence if, "weighing all the attendant factors, including the need for expedition," the evidence proffered is "appropriate given the character and objectives of the injunctive proceeding." Asseo v. Pan Am. Grain Co., 805 F.2d 23, 26 (1st Cir. 1986). Here, the court has relied on the affidavits submitted by the Defendants, reports prepared by NOAA Fisheries, research articles published by scientific journals and by NOAA itself, and a September 17, 2019 Letter from Dr. Scott Kraus and Sixteen Whale Scientists with Expertise on the Right Whale

("Kraus Letter") 2 [#151-6].[11] The court gives no consideration to the allegations in the unverified complaint or to Plaintiff's representations of reports not in the record. The court has declined to hold an evidentiary hearing where this factual record, though extensive, does not present dueling accounts of the dangers posed by VBRs.

IV.    Analysis

    A.  *Facts Likely to be Proven at a Trial*

Based on the evidence in the record, the court finds that if this case were to proceed to a trial on the merits, Plaintiff would likely be able to prove the following facts.

The right whale is a critically endangered species protected under both the Endangered Species Act and the Marine Mammal Protection Act ("MMPA"). 2019 Aff. of Daniel McKiernan, Director of Fisheries Division ¶ 7 [#19-1]. From the beginning of 2010 through the end of 2017, its population, as estimated by federal scientists, declined from over 500 individuals to approximately 411 individual right whales. Id. NOAA's website currently reports that "[t]oday researchers estimate there are about 400 North Atlantic right whales (best estimate is that there were 409 at the end of 2018) with fewer than 100 breeding females left." NOAA Fisheries North Atlantic Right Whale, https://www.fisheries.noaa.gov/species/north-atlantic-right-whale (last accessed Apr. 27, 2020).

Although right whales have a "typical" distribution pattern that extends from the southeast coast of the continental United States to the waters off Nova Scotia and the Gulf of St.

---

[11] Dr. Kraus is a Senior Science Advisor and Chief Scientist of Marine Mammals for the New England Aquarium and also serves as a member on the Atlantic Large Whale Take Reduction Team and is Vice Chair of the North Atlantic Right Whale Consortium. Kraus Letter 6 [#151-6]. Dr. Kraus provided testimony during the hearing on Plaintiff's motion for preliminary injunction in the 2005 action. See Strahan v. Pritchard. 473 F. Supp. 2d 230, 239 (D. Mass. 2007).

Lawrence, it is "not uncommon" for solitary right whales to be observed anywhere within the range of the species. 2019 Aff. of Daniel McKiernan, Director of Fisheries Division ¶ 7 [#19-1]. At the same time, due to habitat changes, right whales have increasingly used Cape Cod Bay as a food source. Id. ¶ 8. This is most prominent in March and April, when large aggregations of right whales have been observed in Cape Cod Bay. Id. ¶¶ 7–8.

Reports submitted by Defendants show that "an encounter with fishing gear is the most frequent cause of documented right whale serious injuries and deaths in recent years." Sean A. Hayes et al., North Atlantic Right Whales – Evaluating Their Recovery Challenges in 2018, NOAA Technical Memorandum NMFS-NE-247 ("Hayes Report") 2 [#130-4]. The entanglement threat is primarily caused by Vertical Buoy Ropes (VBRs), fixed fishing gear with a vertical line from the ocean floor to the surface. 2019 Decl. of Daniel McKiernan, Director of Fisheries Division ¶ 9 [#19-1]; Hayes Report 6 [#130-4]. VBRs are used in both gillnet and lobsterpot fisheries. Id. Although gillnets do entangle right whales, the main threat is presented by lines used in the lobsterpot fishery. Kraus Letter 2 [#151-6]; see also Conservation Law Found., 422 F. Supp. 3d at 15 (quoting Michael Asaro, Chief, Greater Atlantic Region, Marine Mammal and Sea Turtle Branch of NOAA Fisheries, as testifying that "gillnet gear is a minor contributor to the overall right whale entanglement risk . . . because lobster fishing accounts for over 97% of the vertical lines on the east coast").[12] There are an estimated 1,000,000 VBRs placed into the ocean along the migratory route of the right whale. Hayes Report 13 [#130-4]. As a result, "right whales may become entangled in fishing gear [] set anywhere in the range of the species." 2019

---

[12] Although the absolute number of gillnet and trap lines vastly differ, there is no evidence in this record that one type of VBR presents a substantially greater risk of entanglement than another.

Aff. of Daniel McKiernan, Director of Fisheries Division ¶ 9 [#19-1]. Indeed, entanglement has become a fact of life for the animal. A 2012 study found that 85% of right whales had been entangled in fishing gear at least once. Hayes Report 9 [#130-4]. This is an increase from 62% in 1995. Id.

Entanglements pose multiple risks to the whales. Acutely, the entangled whales may become anchored in the VBR and drown. Amy Knowlton et al., Monitoring North Atlantic right whale *Eubalaena glacialis* entanglement rates: a 30 yr retrospective, 466 Marine Ecology 301 (2012) [#173-3]. However, even where the whales do not immediately drown, the drag caused by carrying rope and other gear for long periods of time causes substantial harm to the animals. Hayes Report 12 [#130-4]. Stock reports of the right whale prepared pursuant to the Marine Mammal Protection Act provide sobering descriptions of the effects of entanglement. One typical report, from May 2016 off Chatham, Massachusetts,[13] describes: "New entanglement injuries on peduncle. Left pectoral appears compromised. No gear seen. Significant health decline: emaciated with heavy cyamid coverage. No resights post August 2016." NOAA Right Whale Stock Report 10 [#173-1]. Another, from September 2014 off Nantucket, Massachusetts, reports "Fresh carcass with multiple lines wrapping around head, pectoral, and peduncle. Appeared to be anchored. No necropsy conducted, but extensive, constricting entanglement supports entanglement as [cause of death]." Id. The NOAA report contains dozens of other reports of known entanglements resulting in serious injury or death between 2012 and 2016. NOAA Right Whale Stock Report 8–11 [#173-1].

---

[13] This location notes where the entangled whale was first observed, not necessarily where the whale was entangled.

The harm caused by entanglements is not limited to observable physical trauma. Even where a whale does not suffer an observable serious injury and/or sheds an entangling rope, the consequences of an entanglement can have long-term effects on the whale and the entire species. These include wounds that never heal, damage to baleen plates that can affect the whale's ability to feed, and the stress associated with dragging entangled gear. Hayes Report 16 [#130-4]. This last category presents a particular risk for female right whales since an entanglement has the potential to "reset the clock" for the animal's birthing interval. Some experts associate these entanglements with recent observations showing that the calving interval for female right whales has increased from 4 to 7 years between 2009 and 2019. H.M. Pettis et al., North Atlantic Right Whale Consortium 2019 Annual Report Card 5 [#173-2].

It must be stressed that Defendants to this action have recognized the threat that VBRs present to right whales and have undertaken serious efforts to mitigate the risks of VBRs in Massachusetts coastal waters. These efforts include promulgating regulations "designed to minimize the likelihood of harm to the right whale and other protected marine species from gear entanglement and vessel strikes." 2019 Aff. of Daniel McKiernan, Director of Fisheries Division ¶ 12 [#19-1]. These regulations include restrictions on the use of certain types of fishing gear and the closure of much of Cape Cod Bay to recreational and commercial fishing activities between February 1st and April 30th, when right whales are most abundant in the Bay. Id. ¶ 14 (citing 322 CMR 12.04). Massachusetts regulation grants the Fisheries Division authority to adjust the duration of this enclosure to prevent the entanglement of right whales if "significant aggregations of right whales remain in Cape Cod Bay later than May 1st." Id. ¶ 15 (citing 322 CMR 12.04(3)). Defendants' assertion that the Massachusetts' regulations are "the most protective set of regulations in the country," id. ¶ 25, is undisputed in the record before the court.

Beyond regulations, Defendants engage in a joint effort with other governmental and non-governmental organizations to perform aerial and vessel-based population surveys of Cape Cod Bay during the winter and spring. Id. ¶¶ 17–19. The Fisheries Division uses the results of these surveys to help protect the right whales from danger by observing and removing abandoned and illegally-set traps and also issuing warnings about the presence of the whales to vessel operators. Id. ¶¶ 18–19. The results of these surveys are used to inform the Fisheries Division whether the temporary closure of Cape Cod Bay should be extended pursuant to 322 CMR 12.04(3). Id. ¶ 19.

One of the cooperative agreements Defendants engage in is with the federal government. Annually since 1996, Defendants have applied for and received Section 6 cooperation grants from the Cooperative Endangered Species Conservation Fund. Id. ¶ 11. In awarding the grants each year, NOAA Fisheries reviews information provided by Defendants in an annual update and, most recently, concluded that that "based on that information . . . the Commonwealth has established and continues to maintain an adequate and active program for the conservation of threatened and endangered species consistent with the purposes and policies of the ESA, and as required by ESA Section 6(c)(1)." Oct. 10, 2019 NOAA Fisheries Letter 1 [#185-1]. By statute, NOAA Fisheries may only approve these grants where it finds that "the state agency has established acceptable conservation programs, consistent with the purposes and policies of this Act, for all resident species of fish or wildlife in the State which are deemed by the Secretary to be endangered or threatened, and has furnished a copy of such plan and program together with all pertinent details, information, and data requested to the Secretary." 16 U.S.C. § 1535(c)(1)(B). However, unlike Incidental Take Permits, these grants do not "affect the

applicability of the prohibitions set forth . . . in section 9 of the Act." Oct. 10, 2019 NOAA
Fisheries Letter 6 [#185-1].

Despite the substantial efforts of the Commonwealth, whale entanglements continue. The
last entanglement that has been definitively sourced to gear licensed by Defendants was in
September 2016. This whale was found entangled offshore in federal waters carrying fishing
gear originally set in Cape Cod Bay. 2019 Aff. of Daniel McKiernan, Director of Fisheries
Division ¶ 22 [#19-1]; see also 2020 Aff. of Daniel McKiernan, Director of Fisheries Division
¶ 4 [#179]. While this is the last entanglement that can be definitively sourced to Massachusetts-
licensed gear, the parties agree that it is rare to be able to associate any given entanglement with
a specific fishery. As Daniel McKiernan, the director of the Fisheries Division, explains: "Gear
origin can be ascertained by the permit numbers on the entangling gear when - or if - the gear is
retrieved from the whale. However, most right whale entanglements cannot be attributed to a
specific fishery either because the gear is not recovered or because the identifying portion of the
gear (e.g., the permit numbers on the buoy or the traps or nets) is lost when the whales break the
gear during the entanglement." 2019 Aff. of Daniel McKiernan, Director of Fisheries Division
¶ 9 [#19-1]. Citing published research, the Dr. Kraus letter concludes that "less than one percent
of all entanglements have ever been identified to original location." Kraus Letter 2 [#151-6].
Indeed, the report submitted by Defendants indicates that in the twenty years between 1997
through 2017, there are approximately fourteen entanglements in which the set location and type
of gear are known. Hayes Report 15 [#130-4].

The challenge presented by sourcing these entanglements is highlighted by a widely
reported recent entanglement 45 miles off Nantucket. *Emaciated Adult Female North Atlantic
Right Whale Spotted Entangled off Nantucket*, U.S. Dep't of Commerce, Nat'l Oceanic and

Atmospheric Admin, https://www.fisheries.noaa.gov/feature-story/emaciated-adult-female-north-atlantic-right-whale-spotted-entangled-nantucket (last accessed Apr. 14, 2020). The entanglement was first reported by NOAA on February 28, 2020, and Plaintiff referenced this entanglement one week later during the hearing on the pending motion. The entanglement was described in the NOAA report as one of "particular concern" since the whale, Dragon, was a reproducing female. The whale was found with a buoy and rope lodged in its mouth, forcing it ajar. Per the report, "[t]he animal is emaciated, its skin tone is unusually light, and it has patches of whale lice. These are all indicators of a long-time weakened condition." Furthermore, according to the report, because of the location of the whale and the absence of trailing fishing gear, there were few options for intervention.

## B.  Likelihood of Success on the Merits

Plaintiff has demonstrated a strong likelihood of success on his claim that Defendants have violated the Endangered Species Act's Section 9 prohibitions by permitting the use of VBRs in state waters. In <u>American Bald Eagle</u>, the First Circuit held that to prevail on a claim of an unlawful take under the Endangered Species Act, a plaintiff must show that the alleged activity has actually harmed the species *or* if continued will actually, as opposed to potentially, cause harm to the species. <u>Am. Bald Eagle v. Bhatti</u>, 9 F.3d 163, 166 (1st Cir. 1993). Here, despite the laudable, and sizeable, efforts Massachusetts has taken to reduce the likelihood of entanglement, the evidence portends that Plaintiff will be able to demonstrate that state-licensed VBRs have harmed *and* will continue to harm right whales.

As a preliminary matter, the fact that the State merely licenses the use of VBRs does not preclude liability under the Endangered Species Act. In <u>Strahan v. Coxe</u>, the First Circuit squarely addressed the question of liability for regulatory entities for takes exacted by the

industry the entity regulates. The circuit found that a regulatory scheme causes a prohibited

taking under the Endangered Species Act where the state licenses the use of gear "in specifically

the manner that is likely to result in a violation of federal law." Strahan v. Coxe, 127 F.3d at 163.

Starting with past entanglements, it is uncontroverted that state-licensed VBRs have

entangled endangered whales, and that the most recent known entanglement occurred less than

four years ago, in September 2016. Defendants discount this entanglement because it occurred

prior to Judge Casper's 2018 denial of a temporary restraining order.[14] But the denial of an

emergency motion or even a preliminary injunction is not a decision on the merits. See Univ. of

Texas v. Camenisch, 451 U.S. 390, 395 (1981) ("the findings of fact and conclusions of law

made by a court granting a preliminary injunction are not binding at trial on the merits.").

Plaintiff's 2018 suit was ultimately dismissed without prejudice. Accordingly, the court

considers the undisputed September 2016 entanglement with state-licensed VBRs as part of the

factual record here.[15]

It is further uncontroverted in the record that known entanglements vastly underestimate

actual entanglements.

Looking forward, there is substantial evidence in the record that entanglements will

continue as long as VBRs are deployed in the whales' habitat. Indeed, the evidence submitted by

---

[14] As discussed above, Judge Casper denied that motion, at least in part, because Plaintiff had
failed to comply with the Endangered Species Act's 60-day notice requirement.

[15] Defendants' Opposition 9 [#164] also cites to this court's February 14, 2020 Order [#162]
finding that "no temporary restraining order is appropriate." That Order, however, related to a
motion seeking production of records and other evidence on an emergency basis. The court
found no temporary restraining order appropriate where Plaintiff was being allowed to proceed
with discovery. The court also denied Plaintiff's 2019 request for a temporary restraining order
related to the continued use of VBRs. That order found that emergency motion moot given the
extension of the Cape Cod Bay closure. See Elec. Order [#25].

Defendants appears to demonstrate that, rather than decreasing, the overall entanglement risk for right whales continues to increase. This is despite the establishment of the Atlantic Large Whale Take Reduction Team in 1997, expanded weak link requirements and sinking groundline requirements implemented in 2007, and the implementation of additional closure areas in 2014. Hayes Report 13 [#130-4]. Despite these efforts, there has been an unprecedented *increase* in fatalities in the past three years, which NOAA has declared to be an unusual mortality event. See 2017–2020 *North Atlantic Right Whale Unusual Mortality Event, NOAA Fisheries*, U.S. Dep't of Commerce, Nat'l Oceanic and Atmospheric Admin. (Apr. 16, 2020), https://www.fisheries.noaa.gov/national/marine-life-distress/2017-2019-north-atlantic-right-whale-unusual-mortality-event (last accessed Apr. 28, 2020); Hayes Report 7 [#130-4].

Massachusetts argues that the additional regulations it has promulgated, most notably the seasonal closure of Cape Cod Bay to lobsterpot fishing, makes it so that further entanglements with Massachusetts licensed VBRs are unlikely to occur. However, that this seasonal closure was initiated in 2015 and there was a known entanglement from gear set in Cape Cod Bay in 2016, suggests that since right whales may be found anywhere within the range of the species at any given time, the seasonal closures have reduced but have not ended VBR entanglements. 2019 Aff. of Daniel McKiernan, Director of Fisheries Division ¶ 25 [#19-1]; see also id. ¶¶ 7, 9 ("It is not uncommon for solitary right whales to be observed anywhere within the range of the species"); Kraus Letter 2 [#151-6] ("Entanglements occur everywhere there is fishing gear"); Hayes Report 14 [#130-4] ("there is no place within the fished area along the East Coast of North America for which entanglement risk is zero").

Defendants argue further Plaintiff cannot succeed on his claim because Massachusetts only licenses approximately ten percent of lobsterpots in the U.S. Atlantic lobster fishery. Defs.'

Opp'n 7–8 [#164]. But Defendants offer no authority from which the court may draw any correlation between the percentage of lines and the likelihood of entanglement, where the question would logically be determined in large part also by taking into account the amount of time the right whales spend in Massachusetts water. Given the abundance of right whales in Massachusetts state waters, it is not apparent that Massachusetts licensing only ten percent of lobsterpot traps equates with Massachusetts ropes causing only ten percent of entanglements. Even if it did, and Massachusetts-licensed VBRs were accountable for only ten percent of entanglements, the conclusion that Defendants have violated the Endangered Species Act's Section 9 prohibitions by permitting the use of VBRs in state waters remains.

Defendants argue further that the 2020 NOAA Fisheries report on which Plaintiff relies to classify lobsterpot and gillnet fisheries as a Category I threat—the most severe category of threats—did not single out Massachusetts, but instead was referring to the entire "Northeast/Mid-Atlantic American lobster trap/pot" fishery. Defs.' Opp'n 8 [#164]. While Defendants are correct that the report did not single out Massachusetts, the conclusion remains the same: lobsterpot and gillnet fisheries, including Massachusetts' fishery, are portrayed in the 2020 NOAA Fisheries report as a threat to the right whale.

Defendants also make much of their cooperation with NOAA Fisheries. Defendants state they have worked closely with NOAA Fisheries to ensure the protection of the right whale. 2019 Aff. of Daniel McKiernan, Director of Fisheries Division ¶ 25 [#19-1]; 2020 Aff. of Daniel McKiernan, Director of Fisheries Division ¶¶ 2–3 [#179-1]. The Defendants also point to cooperation agreements with NOAA Fisheries as evidence that Massachusetts has adequate measures in place to protect the right whale. See Suppl. 2020 Aff. of Daniel McKiernan, Director of Fisheries Division and Attached Exhibits [#185]. However, Judge Boasberg's recent findings

that NOAA Fisheries has failed to comply with its obligations under the Endangered Species Act to consider the incidental take of right whales leads the court to place little weight on NOAA Fisheries' ratification of Defendants' efforts. See Conservation Law Found. v. Ross, 422 F. Supp. 3d 12 (D.D.C. 2019); Ctr. for Biological Diversity v. Ross, No. CV 18-112 (JEB), 2020 WL 1809465 (D.D.C. Apr. 9, 2020). Furthermore, even if NOAA Fisheries' determinations as to Defendants' eligibility for Section 6 grants was proper pursuant to the ESA, Defendants have presented no authority for the argument that this analysis is functionally or legally equivalent to the analysis that must occur before NOAA Fisheries grants an Incidental Take Permit pursuant to Section 10 of the ESA.

Finally, Defendants argue that "Plaintiff's request for relief has been previously denied for lack of support, and Plaintiff has not provided any new or additional facts or information to support his present request for preliminary injunctive relief." Defs.' Mem. 9 [#164]. The court has precluded Plaintiff's reliance on facts that predate the last dismissal with prejudice of his claims, which occurred in 2010. The subsequent orders, as noted above, were all determinations on emergency motions where Plaintiff failed to demonstrate that emergency relief was warranted, not judgments barring claims with prejudice. And Defendants' assertion that Plaintiff has not presented any new facts to support his present request for a preliminary injunction is incorrect. Plaintiff has cited letters, reports, and scientific studies that were not before Judge Casper in 2018. Chief amongst these is the September 17, 2019 letter from Dr. Scott Kraus marshaling a number of recent findings from the scientific literature. See Kraus Letter [#151-6]. These findings include the following: First, a 2019 study approximating that for every entanglement that can be sourced to a specific fishery, there are approximately 100 entanglements that cannot be sourced; second, a 2019 study finding that in the last three years,

twenty-eight right whales were found dead, none of natural causes, and with entanglement as the leading cause of death; and third, recent research showing that sublethal effects of entanglements are having a devastating effect on the species. Id. at 1, 2, 4. Dr. Kraus's letter does not stand alone. Indeed, it is entirely consistent with other governmental reports published between 2018 and 2020 submitted into the record by both parties and also consistent with affidavits of the Director of the Fisheries Division. It is, in large part, based on these facts that were *not* before Judge Casper in 2018, *or* Judge Gorton in 2010, that the court reaches the conclusion that Plaintiff has demonstrated a strong likelihood of success on the merits of his claim that Defendants are licensing VBRs in a manner that is proximately causing the ongoing entanglements of whales in the ropes, in violation of Section 9 of the Endangered Species Act.

### C. Irreparable Harm

A preliminary injunction may not issue unless the plaintiff seeking the interlocutory relief demonstrates that irreparable injury is *likely* in the absence of an injunction. Winter v. Natural Res. Def. Council, Inc., 555 U.S. at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief"). "Irreparable injury in the preliminary injunction context means an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." Rio Grande Cmty. Health Ctr., Inc. v. Rullan, 397 F.3d 56, 76 (1st Cir. 2005) (internal quotation marks omitted).

The First Circuit has held that irreparable harm does not follow simply from a court finding a "take" of an endangered species. Animal Welfare Inst. v. Martin, 623 F.3d 19, 26–27 (1st Cir. 2010). Instead, the court must engage in a factual analysis to ensure that an injunction is

necessary so as to protect against a harm that cannot later be remedied. Id. at 27–28 (citing Water Keeper Alliance v. U.S. Dept. of Def., 271 F.3d 21,  33 (1st Cir. 2001) (upholding a district court's denial of a permanent injunction where the district court found that regulations promulgated by the state of Maine did not pose a danger to the species).

Here, the uncontroverted evidence demonstrates that right whales are being pushed towards extinction and that, without intervention, continued entanglements will hasten the end of this species. As an initial matter, it is uncontroverted that the most recent estimate puts the potential biological removal limit for the species at approximately 0.9 whales per year. NOAA Right Whale Stock Report 6 [#173-1]. This number represents the maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population. In contrast, between 2012 and 2016, it was estimated that incidental fishery entanglements resulted in 5.15 right whale deaths per year. Id. The most recent right whale deaths, mostly by entanglement, occurred *following* the 2012–2016 period. See 2017–2019 North Atlantic Right Whale Unusual Mortality Event, NOAA Fisheries (Oct. 4, 2019), https://www.fisheries.noaa.gov/national/marine-life-distress/2017-2019-north-atlantic-right-whale-unusual-mortality-event; Hayes Report 7 [#130-4].

Furthermore, the court finds that irreparable injury to the species will occur even in the absence of a right whale death caused by state-licensed VBRs. As explained in Dr. Kraus's letter, "most entanglements have negative effects on whales, even if they don't kill them." Kraus Letter 4 [#151-6]. This is corroborated by the 2018 NOAA report submitted by Defendants, which reports on the evidence showing that even temporary entanglements can cause increased swimming energy costs, trauma wounds from rope cuts, damage to baleen plates that can prevent efficient filter feeding, and, perhaps most critically, a detrimental effect on the ability for female

right whales to breed. Hayes Report 11–2 [#130-4]. As the Dr. Kraus letter states, "reducing entanglements in east coast waters of the United States is a critical part of a comprehensive strategy for right whale survival and recovery." Kraus Letter 6 [#149-6]. See also Conservation Law Found. v. Ross, 422 F. Supp. 3d 12, 33 (D.D.C. 2019) (finding that reopening certain fisheries to VBRs was "likely to cause irreparable injury to these whales and thus to [plaintiff]").

In summary, the court finds that continued permitting of VBRs by Defendants is likely to result in harms that cannot later be cured. Accordingly, the extraordinary remedy of a preliminary injunction is available if the court concludes that one should issue.

### D.  Weighing the Equities & Fashioning Interlocutory Relief

Before issuing a preliminary injunction, this court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. at 24. In order to effectively do so, the court must first identify the equitable relief under consideration. Even though the court has found that Plaintiff is likely to be able to prove at trial that Defendants are acting in violation of the Endangered Species Act's Section 9 prohibitions, it is not obligated to immediately enjoin the Defendants from the continued licensing of VBRs. TVA, 437 U.S. at 193 ("a federal judge sitting as a chancellor is not mechanically obligated to grant an injunction for every violation of law"). Instead, "[t]he Supreme Court has repeatedly emphasized the broad equitable powers of the federal courts to shape equitable remedies to the necessities of particular cases." S.E.C. v. Wencke, 622 F.2d 1363, 1371 (9th Cir. 1980); see also Strahan v. Coxe, 127 F.3d at 171 ("The district court was not required to go any farther than ensuring that any violation would end").

Plaintiff has requested that the court preliminarily enjoin Defendants as follows: 1) from continuing to license VBRs in Massachusetts state waters; 2) from requiring the use of VBRs by

those seeking to obtain a lobsterpot and gillnet fishing permit; 3) from participating in NOAA's Atlantic Large Whale Take Reduction Team; and 4) requiring Defendants to immediately apply to NOAA Fisheries for an Incidental Take Permit pursuant to Section 10 of the Endangered Species Act. Pl.'s Mot. 2 [#144]. Because Plaintiff's briefs do not meaningfully engage with the issue of why the State Defendant's participation in Atlantic Large Whale Take Reduction Team is unlawful, and the court cannot itself discern one, that issue is not addressed further. Similarly, because the question of whether Defendants may compel Mr. Strahan and others to fish with VBRs rises and falls with the present question of whether Defendants' continued permitting of VBRs should be enjoined, those two questions are considered together.

Although an immediate injunction on the continued licensing of VBRs would end Defendants' probable violations of the Act, such an order would not be consistent with the framework of the statute. Indeed, the Act itself does not even contain such an absolute and unyielding prohibition on takes of endangered species. As reviewed above, the Act allows for incidental takes of endangered species if the expert agency finds, inter alia, that an applicant has taken all necessary steps to mitigate the effects of its activities and finds that continuing the activity will not jeopardize the survival and recovery of the species. See 16 U.S.C. § 1539(b); Section I, *supra*. By their briefs and affidavits, this is essentially the conclusion that Defendants ask this court to make: that while state-licensed VBRs have entangled whales and are likely to continue to do so, the mitigation efforts are enough to excuse the rare incidental take caused by VBRs. The Act does not give this court the authority or discretion to decide which Section 9 violations are excusable and which are not. Instead, Congress has vested such authority with NOAA Fisheries. If NOAA Fisheries were to agree that Defendants' efforts are sufficient and issues an Incidental Take Permit, Plaintiff would no longer have any claim against Defendants

arising under Section 9 of the Endangered Species Act. Accordingly, the court concludes that allowing the Incidental Take permitting process to take place ensures Congress's objectives for the Act are achieved.

Furthermore, the court finds that an immediate injunction would not be equitable under the facts here. Massachusetts regulators and fishermen have made substantial efforts to reduce the collateral effects of lobsterpot and gillnet fishing in state waters. Based on the record before the court, these efforts stand in relief to efforts undertaken by other jurisdictions that may pose an even larger threat to the right whale and other endangered species. While the court cannot simply ignore a violation of the Endangered Species Act in Massachusetts because a non-party is engaged in the same activity, it *must* attempt to fashion interlocutory relief that is equitable. Trump v. Int'l Refugee Assistance Project, 137 S. Ct. 2080, 2087 (2017) ("The purpose of such interim equitable relief is not to conclusively determine the rights of the parties but to balance the equities as the litigation moves forward . . . . In the course of doing so, a court need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case") (internal citations omitted). Here, the court finds Plaintiff's request that the court immediately enjoin further licensing of VBRs in state waters to be inequitable to Massachusetts fishermen unless the Defendants are first provided some time to allow the Incidental Take permitting process to play out.

Having framed the preliminary injunctive relief under consideration, the court now proceeds to balance the hardships and consider the public interest in granting or withholding this relief. As an initial matter "by enacting the ESA, Congress has already determined that the balance of hardships and the public interest tips heavily in favor of protected species." Water Keeper, 271 F.3d at 34 (citing Strahan v. Coxe, 127 F.3d at 171). At the same time,

Massachusetts fishermen will be harmed if they are enjoined from being able to fish in Massachusetts waters. The relief fashioned by the court is designed to allow Defendants time to apply for and receive a determination on whether the state qualifies for an Incidental Take Permit under the criteria set forth by Congress in Section 10 of the Endangered Species Act. Accordingly, if Defendants are able to obtain such a permit, the hardship imposed by today's order is merely one of process. If Defendants are not able to obtain a permit, then the hardship that may ultimately result from the court's order is no more than the result of Congress's decision to "halt and reverse the trend toward species extinction, whatever the cost." TVA, 437 U.S. at 184. For these reasons, the court finds that the balance of hardships and public interest weigh heavily in favor of the preliminary relief ordered here.

V.   Conclusion

For the foregoing reasons, the court finds that an injunction should issue pending a resolution on the merits of this action. Accordingly, the following is ORDERED:

Defendants are hereby ordered to promptly seek an Incidental Take Permit pursuant to Section 10 of the Endangered Species Act.

Plaintiff may renew his motion for a preliminary injunction enjoining Defendants from licensing fishing activities that use Vertical Buoy Ropes in Massachusetts state waters if Defendants have not obtained an Incidental Take Permit within ninety (90) days of this Order.

IT IS SO ORDERED.

Date: April 30, 2020

/s/ Indira Talwani
United States District Judge