UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RICHARD MAX STRAHAN, <br><br> Plaintiff, <br><br> v. <br><br> SECRETARY, MASSACHUSETTS EXECUTIVE OFFICE OF ENERGY AND ENVIRONMENTAL AFFAIRS, *et al.*, <br><br> Defendants, <br><br> and <br><br> MASSACHUSETTS LOBSTERMEN'S SURVIVAL FUND, <br><br> Intervenor-Defendant. | Civil Action No. 1:19-cv-10639-IT |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON STANDING AND ORDER ON INTERVENOR'S MOTION FOR JUDGMENT ON PARTIAL FINDINGS

November 30, 2021

TALWANI, D.J.

Plaintiff Richard Max Strahan brought this suit pursuant to the citizen-suit provision of the Endangered Species Act ("ESA"). The action challenges the Commonwealth of Massachusetts' licensing of vertical buoy ropes for deployment in Massachusetts waters as causing unlawful "takes" of endangered North Atlantic right whales and leatherback turtles. At trial, however, Strahan failed to establish standing under Article III of the Constitution. Accordingly, as detailed below, the court does not have jurisdiction to determine the merits of Strahan's claim and will dismiss this action.

I.   **Relevant Procedural Background**

The background of these proceedings is detailed in the court's Memorandum and Order [#610].

With regard to standing, the Amended Complaint ¶ 26 [#68] alleged that: (1) Strahan conducts research on endangered species of whales and sea turtles off of the United States northeast Atlantic coast and that the species' decline and extinction are adversely affecting his scientific research; (2) he is "an enthusiastic 'whale watcher' off the coastline of Massachusetts, New Hampshire and Maine" and the species' decline impacts his personal access to whales for viewing activity; (3) he is a licensed commercial fisherman in New Hampshire who does not seek to cause entanglement but does seek to offer lobsters that were harvested in an environmentally safe manner, and the Commonwealth Defendants' requirements are "antithetical to his commercial interests"; and (4) he operates a business in New Hampshire, Massachusetts and Maine in which his customers pay him money to stop the killing of whales and sea turtles, and the Commonwealth Defendants' continued licensing of vertical buoy ropes is "antithetical to [his] business interests." Id. At trial, Strahan offered exhibits and his own testimony to support his standing allegations; the Commonwealth Defendants and Intervenor Massachusetts Lobstermen's Survival Fund (the "Fund") (together "Defendants") addressed standing by cross-examining Strahan.

At the conclusion of Strahan's case, Defendants sought a directed verdict, and the court took the oral motions under advisement. See Elec. Clerk's Notes [#539].

At the conclusion of trial, the parties submitted proposed findings of fact and conclusions of law. See Pl.'s Corrected Prop. Findings of Fact and Conclusions of Law [#600]; Comm.'s Prop. Findings of Fact [#577]; Comm.'s Prop. Conclusions of Law [#576]; Fund's Prop.

2

Findings of Fact and Conclusions of Law [#570]. The Commonwealth Defendants argued, *inter alia*, that Strahan's suit must be dismissed for lack of standing, Comm.'s Prop. Conclusions of Law 2-18 [#576], while the Fund also filed, *inter alia*, its Confirmatory Motion for Judgment on Partial Findings [#573] to "confirm" its oral motion for a directed verdict with respect to standing and liability.

**II.     Findings of Fact**

   *A.     Defendants' Challenge to Strahan's Credibility*

Defendants urge the court to find Strahan not credible because of his conduct during this proceeding. Defendants point to filings that Strahan submitted to the court to establish service of process on two defendants initially named in this action. See Summonses [#225], [#226]. When counsel for the Commonwealth questioned Strahan on whether he had caused false information to be submitted to the court, Strahan asserted his Fifth Amendment right to remain silent. Day 3 Trial Tr. at 6:2–22, 7:17, 15:9–16, 15:18–24. Defendants also point to Strahan's nonresponsive and flippant answers at trial. See, e.g., Day 2 Trial Tr. at 75:3–24, 149:7–8, 150:12–25, 151:1–25, 152:1–25.

In assessing Strahan's testimony, the court finds some, but not all, credible. In general, where Strahan was testifying about facts that could be independently verified and that supported his position, his testimony was quite detailed and credible. In contrast, where Strahan was testifying about independently verifiable facts that did not support his position or where he seemed to be trying to second-guess the legal implications, he became evasive or nonresponsive as to the facts.

Finally, where Strahan was testifying about facts that could not be independently verified, his testimony was least compelling. In this regard, the court notes that while Strahan has a right

not to answer questions that may cause him to incriminate himself, the court may draw an adverse inference against civil litigants who refuse to provide testimony on Fifth Amendment grounds. In re Carp, 340 F.3d 15, 23 (1st Cir. 2003) (citing Mulero–Rodríguez v. Ponte, Inc., 98 F.3d 670, 678 (1st Cir. 1996)). The court finds an adverse inference is appropriate here, that it is more likely than not that Strahan knowingly submitted a filing containing false information to the court in an effort to advance his litigation goals and that this goal-driven conduct does undermine Strahan's character for truthfulness in those circumstances where the facts could not easily be independently verified.

      *B.      Strahan's Advocacy Work*

      For decades, Strahan has pursued "the ruthless, strict enforcement of ESA Section 9 prohibitions," in an effort to protect endangered wildlife. Day 2 Trial Tr. 93:12–13; see also id. at 95:1–4 ("I was trained to see that the Endangered Species Act . . . would provide for ruthless enforcement of the take prohibitions, so I chose to go the route of the Endangered Species Act"). Over the past ten years, Strahan has spent a significant portion of his time (by his estimate, sixty hours per week) considering how to stop the killing, and "ensure the birth, feeding, reproduction and survival," of endangered wildlife. Id. at 78:19–79:4, 80:6–8. Strahan does not have an employer, but "serve[s]" the Calm Earth Corporation, a corporation that was created after this litigation was commenced, where he holds the title of "chief . . . science officer." Id. at 78:19–20, 143:11–15, 144:3–6. Strahan described his work as "a preservation scientist for biological diversity," in which he considers "the matrix of factors" that contribute to the killing of wildlife and methods for effecting the "minimization or elimination of anthropogenic killings." Id. at 78:20–79:4.

Strahan's general interest in endangered wildlife populations led to his advocacy regarding the North Atlantic right whales. As Strahan explained:

> the right whale situation was really interesting because here's a species that's charismatic and they were not being subject to even – federal government had not developed a recovery plan. There was no recovery team. There were no regulations. There were no efforts going on, no – and I thought this was a great example to continuously study, to demonstrate the efficacy of the Endangered Species Act and whether or not mass extinction could be quantitatively assessed as, you know, imminent, ongoing, using the right whale as a case history.

Id. at 82:6–19.

Strahan's interests in what occurs in Massachusetts waters is similarly strategic. As he explained:

> I decided . . . that the keystone player in fisheries regulations was not [National Marine Fisheries Services ("NMFS")], but state governments. So I decided . . . that Massachusetts was the ideal state to try and protect the right whale in and to get that government to commit itself to recovery effort for the whale. . . .
>
> . . . I decided to get the state government to commit itself to recovery effort of the whale, which I would hope would lead to a national one also.

Id. at 83:17–84:1, 84:13–16.

In the late 1980s, Strahan lobbied the Massachusetts legislature for funding for a North Atlantic right whale research program and for the introduction of legislation to protect the right whale. Id. at 85:23–86:2. Strahan has filed twenty to thirty lawsuits concerning endangered whales since 1994. Id. at 90:17–20, 91:3–6.[1]

The court finds fully creditable Strahan's stated interest in, and dedication to, the protection of wildlife in general and to the "ruthless, strict enforcement of the ESA Section 9

---

[1] Strahan stated that during the past year, he has devoted over sixty hours a week to issues regarding the North Atlantic right whale, Day 2 Trial Tr. 80:6–14, and more generally, that he spent fifty to sixty percent of his time over the last thirty years devoted to issues related to the North Atlantic right whale, id. at 81:5–9.

5

prohibitions." Id. at 93:12. The court finds his activities relating to right whales to be part of his strategy relating to wildlife protection in general.[2]

  C.  *Strahan's Research*

At trial, Strahan introduced evidence of his efforts to evaluate the degree to which right whales and sea turtles are entangled in Massachusetts waters. For example, he had communications with Amy Knowlton at the New England Aquarium in 2018, in which he requested close-up pictures and the geographic coordinates of an entangled right whale. See Ex. 627. Strahan testified to emailing with Ms. Knowlton on many occasions, asking her to share data in the aquarium's possession. Day 2 Trial Tr. 111:2–14. Strahan states that he sought this information as part of his efforts "to document . . . the size of the population and what evidence [the aquarium] had about it." Id. at 112:13–18.

Strahan also describes obtaining a video of the Massachusetts environmental police disentangling a leatherback sea turtle that was entangled in a vertical buoy rope on Buzzards Bay, that he then distributed, and included in the litigation. Id. at 91:24–92:10.

Strahan provided no evidence, however, that he has personally undertaken any "scientific research" on the animals themselves or personally conducted any field studies on right whales.

---

[2] Strahan stated further that he was interested in sea turtles as a good "poster child[]" for endangered wildlife because their populations may serve as a barometer of the health of the coastal ecosystem. Id. at 97:11–15. Strahan explained that he "researched" the sea turtles "and found . . . what role the turtles played . . . in the matrix of public policy" and that "they would serve to protect the environment." Id. at 97:15–20. Strahan further testified that he performed advocacy for the sea turtles "the same [as he does] with right whales." Id. at 97:21–25. Despite Strahan's use of sea turtles as part of his general advocacy on behalf of wildlife, he did not demonstrate any specific interest particular to sea turtles.

6

Instead, Strahan's research is focused on the legal and regulatory scheme protecting endangered species. In 2009, Strahan wrote a law review article examining the federal scheme for the protection of large whales entitled A New Paradigm for Conservation of Great Whales in the Urban Sea of the United States—Species in Need of a "Green Knight," which was published in the Boston College Environmental Affairs Law Review. Id. at 107:4–7, 18–22, 19–22; Ex. 587. His recent master's thesis, entitled Goodbye and Thanks for All the Fish: the Inevitable Extinction of Vertebrate Wildlife in the United States by [2100 AD], similarly discusses the right whale as an example of a species facing "inevitable extinction." Day 2 Trial Tr. 72:20–73:2, 77:18–25. These writings were part of his advocacy work on behalf of endangered species. Id. at 107:13–17.[3]

    D.    *Strahan's Aesthetic Interest in Whales and Sea Turtles*

The court did not find Strahan's claim to be an "avid whale watcher" for North Atlantic right whales or to have an aesthetic interest in leatherback sea turtles credible.

Strahan was vague and evasive about his whale watching activities. He asserted that he has "gone whale watching," id. at 119:11, with no specifics as to whether his purported whale watching had occurred in the last five years or thirty years ago, whether the claimed whale watching was by boat or from the land, and on which coast. He claimed further that "[e]very

---

[3] Strahan moved to admit his master's thesis (marked as Exhibit 429) into evidence at trial; the Commonwealth Defendants objected. Day 2 Trial Tr. 78:1–16. The court sustained the objection, excluding Strahan's thesis where the court had previously granted in part the Commonwealth Defendants' Motion in Limine to Preclude Expert Testimony of Strahan [#415], see Mem. & Order 16 [#497], and as a fact witness, Strahan's scholarly conclusions about the extinction of the right whale were inadmissible, id. The court notes, however, that had the thesis been admitted for the purpose of establishing Strahan's standing, the content would not have changed the court's conclusion here.

7

time I go to the Cape, or close to the coastline right in New Hampshire, we look for whales," id. at 120:18–19, again with no specifics. He asserted that he "looked in Boston Harbor right now today for right whales," and that he would be looking for right whales the next day in Boston Harbor (with no suggestion that Boston Harbor is a likely habitat for them), and that he was "going whale watching next week," with no details as to the supposed trip. At the same time, when asked if he had ever seen a North Atlantic right whale, he responded: "Well, you can't really see a right whale." Id. at 119:16.[4]

While the court does not dispute that Strahan likely looks towards the ocean on occasion, the court does not find as a factual matter that this amounts to "whale watching" for North Atlantic right whales.

Strahan also has never seen a live leatherback sea turtle. Id. at 121:6–9. As with the right whales, Strahan claimed that he "look[s] for turtles and seals when [he] walk[s] along the beach." Id. at 121:11–12. Again, Strahan gave no details regarding any such walks. But even assuming the court credits that Strahan looks for wildlife generally when he does walk on the beach, the court finds no evidence that Strahan has taken any steps to specifically view leatherback turtles.

E.  *Strahan's Interest in Commercial Lobster Fishing*

Strahan applied for and obtained a commercial fishing license in New Hampshire when he moved there in 2018. Id. at 117:12–20, 150:9–11. He fishes from shore or from

---

[4] After a nudge from his counsel, Day 2 Trial Tr. 119:17 ("I'm sorry, Mr. Strahan –"), Strahan stated further "[a]ll right. Yes. Hear you. I think one time I was on Cape Cod, and some whales were going by. It could have been a right whale. I was looking for right whales." Id. at 119:18–20. The court finds this colloquy detracts from, rather than advances, Strahan's claim to be a whale watcher.

8

a pier, not from a boat, and has set lobster pots in water without vertical buoy lines. Id. at 153:1–7, 153:20–154:1, 154:12–16, 154:20–22.

    *F.*    *Strahan's Business in Which Customers Pay Him Money to Stop the Killing of Whales and Sea Turtles*

Strahan alleged in his Amended Complaint ¶ 26 [#68] that he operates a business in New Hampshire, Massachusetts, and Maine in which his customers pay him money to stop the killing of whales and sea turtles. Strahan offered no evidence as to this allegation at trial.

    *G.*    *Strahan's Spiritual Connection to Endangered Species*

Strahan testified to his spiritual commitment to endangered species:

> my religious belief is that it is my duty, given to me by my Gaia, goddess, that it is my duty as a sentient being to protect life on the planet Earth and stop its extinction, to protect the biodiversity regardless of the adverse impact on my society, myself, or my species. And I have to practice this. This is an act, where I live this daily.
>
> It is a -- it is my spiritual commandment, like Christians have their ten commandments. This is my commandment, and I believe scholarly and scientifically that this is an example of objective morality. It's an issue of morality and ethics to be a sentient being on earth.

Day 2 Trial Tr. 115:19–116:5. The court found fully credible that Strahan views protecting endangered species in general to be his mission in life. The court makes no finding as to whether this motivation amounts to a "spiritual commandment."

## III. Conclusions of Law

    *A.*    *Legal Standard*

The citizen-suit provision of the ESA grants "any person" the authority to commence a civil suit in United States district courts to enforce a violation of any provision of the Act. 16 U.S.C. § 1540 (g)(1). This is "an authorization of remarkable breadth," Bennett v. Spear, 520

9

U.S. 154, 164 (1997), that abrogates a traditional prudential limitation that "a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." Id. at 162-64.

But while Congress may abrogate prudential limitations on jurisdiction, "[i]t is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." Spokeo, Inc. v. Robins, 578 U.S. 330, 339 (2016) (quoting Raines v. Byrd, 521 U.S. 811, 820 n.3 (1997)). Under Article III of the Constitution, federal courts may only exercise jurisdiction over "the resolution of 'Cases' and 'Controversies.'" TransUnion LLC v. Ramirez, ___ U.S. ___, 141 S.Ct. 2190, 2203 (2021) (quoting U.S. Const. Art. III). For there to be a case or controversy, "the plaintiff must have a 'personal stake' in the case—in other words, standing." Id. (quoting Raines, 521 U.S. at 819).

A plaintiff invoking federal jurisdiction bears the burden of establishing standing. Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992). Moreover, since standing is not a "mere pleading requirement[] but rather an indispensable part of the plaintiff's case," standing must be supported "with the manner and degree of evidence required at the successive stages of the litigation." Id. While at the pleadings stage, "general factual allegations of injury" may suffice, and at summary judgment, such allegations must be supported by affidavits which will be taken to be true, where standing remains a controverted issue at trial, the specific facts establishing standing "must be 'supported adequately by the evidence adduced at trial.'" Id. (quoting Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 114, 115 n.31 (1979)); see also Strahan v. Nielsen, 2018 WL 3966318, *4 (D.N.H. Aug. 17, 2018) (finding standing on a motion to dismiss but noting that his standing allegations "must ultimately be proven").

10

To establish standing, "plaintiffs must show (1) that they have suffered an injury in fact, (2) that the injury is fairly traceable to the [defendant's] allegedly unlawful actions, and (3) that 'it [is] likely . . . that the injury will be redressed by a favorable decision.'" Nulankeyutmonen Nkihtaqmikon v. Impson, 503 F.3d 18, 26 (1st Cir. 2007) (quoting Defs. of Wildlife, 504 U.S. at 560-61); see also Animal Welfare Inst. v. Martin, 623 F.3d 19, 25 (1st Cir. 2010) (same).

1. Injury in Fact

An "injury in fact" is "an invasion of a legally protected interest, which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." Nulankeyutmonen Nkihtaqmikon, 503 F.3d at 26-27 (quoting Defs. of Wildlife, 504 U.S. at 560). A concrete injury "must be 'de facto'; that is, it must actually exist." Spokeo, 578 U.S. at 340. Both tangible and intangible injuries may be concrete, but the injury must be real, rather than abstract, to be concrete. Id. For an asserted injury to be particularized, the plaintiff must be "affect[ed] . . . in a personal and individual way." Id. at 339 (quoting Defs. of Wildlife, 504 U.S. at 560 n.1).

For example, in Sierra Club v. Morton, the plaintiff, an environmental interest group, challenged a proposed recreational development project in a national game refuge and forest, alleging that it would "adversely affect the scenery, natural and historic objects and wildlife of the park and would impair the enjoyment of the park for future generations." 405 U.S. 727, 734 (1972). The Supreme Court "d[id] not question" that "this type of harm may amount to an 'injury in fact' sufficient to lay the basis for standing," acknowledging that "[a]esthetic and environmental well-being . . . are important ingredients of the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process." Id. But the Court

explained that standing requires that "the party seeking review be himself among the injured." Id. at 735. While the complaint alleged an injury that would be felt directly "by those who use [the area]," the Court found critical that the plaintiff "failed to allege that it or its members would be affected in any of their activities or pastimes by the . . . development." Id. Namely, the plaintiff did not assert "that its members use [the area] for any purpose, much less that they use it in any way that would be significantly affected by the proposed actions." Id.; see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 887 (1990) (holding that an alleged injury was insufficient to establish standing where the plaintiffs did not use land actually in the area affected by the challenged activity but instead only roughly "in the vicinity" of the affected land).

In another example, in Lujan v. Defs. of Wildlife, the plaintiff organization challenged an agency interpretation limiting the scope of the ESA from reaching agency actions taken abroad. 504 U.S. 555 (1992). The plaintiff organization submitted, *inter alia*, affidavits from two members, each stating that they previously had travelled abroad and while abroad had observed the habitat of endangered species, intended to do so again, and asserted that the agency's interpretation of the ESA would harm them because it would reduce their likelihood of spotting endangered species in their anticipated, but not-yet-planned, future travels. Id. at 563-64. The Supreme Court held that the affiants' past visits "prove[] nothing" as past exposure to illegal conduct did not create a case or controversy for injunctive relief. Id. at 564 (citing City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983)). As to the affiants' future plans, the Supreme Court held that "'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." Id.

In Friends of the Earth, Inc. v. Laidlaw Envt'l. Servs. (TOC), Inc., the Supreme Court provided an example of the type of individualized and concrete harm that would give rise to a finding of an injury-in-fact in the context of environmental litigation. 528 U.S. 167 (2000). There, the plaintiff organizations submitted affidavits averring that their members lived in proximity to the land in question, that they would occasionally visit the area and be subject to the adverse effects of pollution in the area, and that they would like to recreate in the area but could not do so out of concern about pollution. Id. at 181-83 The Court found under the principle articulated in Sierra Club and Defs. of Wildlife that these affidavits established standing as to those "'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." Id. at 183 (quoting Sierra Club, 405 U.S. at 735). Moreover, the Court found, the affiants' declarations were not the type of "'speculative some day intentions' to visit endangered species halfway around the world that [the Court] held insufficient to show injury in fact in Defs. of Wildlife." Id. at 184 (citing Defs. of Wildlife, 504 U.S. at 564).

In this circuit, courts have similarly found injury-in-fact properly established where the facts adduced support the conclusion that the plaintiffs have an established aesthetic or recreational interest in the species and that this recreational or aesthetic interest will be harmed by the threat of the challenged activity to the species. For example, in Animal Welfare Inst. v. Martin, 623 F.3d at 26, the First Circuit found that the plaintiff organizations had established an injury-in-fact. The First Circuit noted "Plaintiffs' affidavits from members who are Maine residents assert the members frequently visit wildlife refuges and parks in Maine to try to observe lynx and other wildlife species" and "that Maine's trapping regulations, by causing Canada lynx to be taken, interfere with the Canada lynx's natural state and may increase the animals' risk of death, reducing the likelihood that the members will observe Canada lynx in

13

their natural state on future visits." Id. at 25. More recently, in Rowley v. City of New Bedford, the district court found that the plaintiff had adequately alleged standing in an ESA lawsuit claiming that the practices of the city's zoo harmed its two endangered elephants. 333 F.Supp.3d 30, 36 (D. Mass. 2018). The court found that the plaintiff had adequately alleged an injury in fact where she stated that she visited the zoo on a near daily basis to observe and communicate with the elephants, had developed an aesthetic, emotional, and spiritual relationship with the elephants, and that the enjoyment she received from viewing the elephants was greatly diminished due to witnessing their suffering. Id. at 36-37.

        2.        Causation and Redressability

Standing also requires causation and redressability, which "'overlap as two sides of a causation coin.'" Carpenters Indus. Council v. Zinke, 854 F.3d 1, 6 n.1 (D.C. Cir. 2017) (quoting Dynalantic Corp. v. Dep't of Def., 115 F.3d 1012, 1017 (D.C. Cir. 1997)). As one court put it, "if a government action causes an injury, enjoining the action usually will redress that injury." Id.

    *B.*    *Discussion*

The court considers the various interests asserted by Strahan. As detailed below, as to certain asserted interests, Strahan's claim fails based on the lack of credible evidence. As to others, Strahan's evidence is credible, but the facts fail to establish an injury-in-fact.[5]

---

[5] The court therefore does not need to reach causation and redressability. The court notes that the Commonwealth Defendants do not challenge causation and redressability as to claims relating to the right whale. Comm.'s Prop. Rulings of Law 15 [#576]. The Fund does challenge causation and redressability, arguing that the injury is not caused by the Defendants and thus is not redressable in a suit against the Defendants, where the Commonwealth is not free to set its own regulations and the regulatory scheme for marine mammals is decided instead by National Marine Fishery Service. Intervenor's Prop. Findings of Fact and Conclusions of Law 62-64 [#570]. For the reasons set forth more fully in the court's Memorandum and Order [#610] denying the Fund's renewed Motion for Judgment on Partial Findings [#571], the court has

1. Strahan's Advocacy Work

Strahan points to his "decades-long interest in and commitment to the protection of endangered marine species, particularly the North Atlantic right whale, through academic work, legislative and legal advocacy, public education and outreach . . . ." Pl.'s Prop. Findings of Fact and Conclusions of Law 116-17 [#600]. As discussed above, the court generally credits Strahan's testimony that he has had a longstanding interest in the "ruthless, strict enforcement of the ESA Section 9 prohibitions," in an effort to protect endangered wildlife. This interest is evidenced by his legislative advocacy with the Massachusetts Legislature, legal advocacy through the courts, and public advocacy through education and outreach targeted to raise awareness about endangered marine species, and in particular, the North Atlantic right whale.[6]

However, "mere 'interest in a problem,' no matter how longstanding," is not sufficient to confer standing. Sierra Club, 405 U.S. at 735, 739. Thus, an injury-in-fact may not be established by Strahan's "sincere and passionate interest in the well-being of the whales" alone. Strahan v. Linnon, 967 F. Supp. 581, 617 (D. Mass. 1997), aff'd, 187 F.3d 623 (1st Cir. 1998). Instead, Strahan "must show not only that the named whales are harmed by the [Defendants'] actions, but also that he will thereby be 'directly affected' by the harm to the whales, *apart from his . . . special interest as a dedicated advocate for endangered species and as a religious supporter of biological diversity*." Id. (emphasis added).

---

rejected this argument where Massachusetts is free to deploy environmental regulations in state waters that would protect the North Atlantic right whale, redressing Strahan's alleged injuries.

[6] Strahan did not introduce similar evidence of substantial advocacy on behalf of sea turtles.

2.	Strahan's Research

Strahan's allegations that he "is engaged in scientific research on the Northern Right whale" were sufficient for standing in decisions issued at earlier stages in those proceedings. Strahan v. Coxe, 939 F.Supp. 963, 978 (D. Mass. 1996), aff'd in part and vacated in part, 127 F.3d 155 (1st Cir. 1997) (finding standing on a motion for a preliminary injunction in part based on Strahan's affidavit that he is engaged in scientific research on the right whale); Linnon, 967 F.Supp. at 617 (finding standing on a motion for summary judgment based on affidavits and deposition testimony, including that Strahan is "organizing an extensive in-field research effort to do field research on whales with [his] own dedicated vessel"). But here, the specific allegations Strahan relied on to establish standing at earlier stages now "must be 'supported adequately by the evidence adduced at trial,'" and Strahan has failed to show that he is engaging directly in any such scientific research. See Defs. of Wildlife, 504 U.S. at 561.

Strahan offered no evidence of scientific research he has conducted or plans to conduct on whales or sea turtles. He testified to no field research, no dedicated vessel, no planned experiments, no independent gathering of data—in sum, no efforts at generating new scientific knowledge from direct study of the right whale itself. What Strahan labels "scientific research" is instead his gathering of information from others in support of his advocacy on behalf of endangered species. While this may suffice as non-scientific academic study, it does not amount to active engagement in scientific research that will be "directly affected" by changes to the whale population off the coast of Massachusetts "apart from [Strahan's] special interest in the subject." Defs. of Wildlife, 504 U.S. at 556.

Having failed to establish his engagement in scientific research, Strahan can articulate no concrete interest in scientific research that is injured by Defendants' actions.

16

      3.      Strahan's Aesthetic Interest in Whales and Sea Turtles

Strahan claimed to personally be "an enthusiastic 'whale watcher' off the coastline of Massachusetts, New Hampshire and Maine." Am. Compl. ¶ 26 [#68]. Again, Strahan's similar allegations were found sufficient for standing in decisions issued at earlier stages in other proceedings. In Strahan v. Coxe, for example, the court took judicial notice of Strahan's prior testimony under oath and an affidavit stating that he "regularly observes whales in Massachusetts waters." 939 F.Supp. at 978. As the court noted, "[r]egular observation of endangered whales in Massachusetts waters is a cognizable interest for standing purposes." Id. (citing Defs. of Wildlife, 504 U.S. at 562–63).

As detailed above, however, the court did not find Strahan's claim to be an "avid whale watcher" of right whales or to have an aesthetic interest in leatherback sea turtles credible. Although "the desire to . . . observe an animal species, even for purely aesthetic purposes, is undeniably a cognizable interest for the purpose of standing," Defs. of Wildlife, 504 U.S. at 562-63, standing requires that "the party seeking review be himself among the injured," Sierra Club, 405 U.S. at 734-35. Moreover, even crediting Strahan's desire to see endangered whales in general, Strahan's showing fails where he has not established his injury as to the specific species at issue. See Citizens to End Animal Suffering & Exploitation, Inc. v. New England Aquarium, 836 F. Supp. 45, 52 (D. Mass. 1993) (finding no cognizable harm where plaintiffs failed to show they went to the Aquarium and "observed [the specific dolphin at issue] as opposed to dolphins in general, at the Aquarium").

Strahan may well have hopes to view whales in the future, or may seek to go whale watching in the future, but "'some day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the

17

'actual or imminent' injury that our cases require." Defs. of Wildlife, 504 U.S. at 564; see also Linnon, 967 F.Supp. at 617 (holding conclusory statements expressing intent to watch whales in the Pacific Ocean, "which lack any support such as specific dates or funding sources, are insufficient to confer standing to challenge" activities in those waters.)

While Strahan may contend that his plan to see whales the following week was sufficiently concrete, it fails where the testimony was not credible. Accordingly, Strahan's standing cannot be based on this alleged injury.

### 4. Strahan's Interest in Commercial Lobster Fishing

Strahan asserted an interest in engaging in commercial lobster fishing without using vertical buoy lines. He has not shown, however, how Massachusetts regulations pose an actual or imminent injury to this interest. First, he obtained a commercial fishing license in New Hampshire, not Massachusetts, when he moved to that state in 2018. Day 2 Trial Tr. 117:12–20, 150:9–11. Moreover, he fishes from shore or from a pier, not from a boat, and in so doing, is able to set lobster pots in water without vertical buoy lines. Id. at 153:1–7, 153:20–154:1, 154:12–22.

### 5. Strahan's Business in Which Customers Pay Him Money to Stop the Killing of Whales and Sea Turtles

Strahan alleged in his Amended Complaint ¶ 26 [#68] that he operates a business in New Hampshire, Massachusetts and Maine in which his customers pay him money to stop the killing of whales and sea turtles. As noted above, Strahan offered no evidence as to this allegation at trial, and accordingly, this alleged business interest is not a basis for standing.

### 6. Strahan's Spiritual Connection to Endangered Species

While Strahan has articulated a spiritual connection to endangered species, the claim differs significantly from those more concrete claims – tied to visits to certain locations or observations of species – recognized by courts. See, e.g., Pit River Tribe v. U.S. Forest Serv.,

469 F.3d 768, 779 (9th Cir. 2006) (tribe that had used lands in question "for cultural and religious ceremonies 'for countless generations'" had adequately demonstrated an injury in fact); see also Ctr. for Biological Diversity v. Env't Prot. Agency, 861 F.3d 174, 183-84 (D.C. Cir. 2017) (finding injury-in-fact in part based on association's member's expressed "recreational, scientific, aesthetic, educational, moral, spiritual and conservation interests" "in observing the [endangered species] in its natural . . . habitat, a habitat that [the member] "regularly visit[s] . . . three-to-four times a year"). Strahan's stated spiritual interest, however, is not in the right whales themselves, or even their habitat, but rather in a "spiritual commandment" that creates a moral "duty . . . to protect life on the planet Earth." Day 2 Trial Tr. 115:17–25. Where Strahan's spiritual interest lacks concrete elements that the challenged actions directly impact, the court finds the spiritual interest is not the equivalent of "activities or pastimes" that are required to confer standing. See Sierra Club, 405 U.S. at 735, 739.

  C. *Legal Conclusion*

For the reasons set forth above, the court finds that Strahan has not established standing under Article III of the Constitution. Accordingly, the court does not have jurisdiction and must dismiss the action.

**IV.** **Intervenor's Motion for Judgment on Partial Findings**

The Fund sought judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c) asserting, *inter alia*, that Strahan has failed to prove that he has standing to sue. See Confirmatory Mot. for J. on Partial Findings [#573]. As set forth above, the court agrees that Strahan failed to prove standing. Where Strahan does not have standing, however, the court is without jurisdiction over the case, and the proper remedy is a dismissal for lack of jurisdiction,

rather than a defense judgment. See Fed. R. Civ. P. 12(h)(3) ("[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action").

## V. Conclusion

For the reasons set forth above, the court finds that Strahan has not established standing under Article III of the Constitution. Accordingly, the court does not have jurisdiction and will dismiss the action. The Fund's Motion for Judgment on Partial Findings [#573] is denied as moot.

IT IS SO ORDERED.

November 30, 2021

/s/ Indira Talwani
United States District Judge